[Cite as *State v. Hall*, 2018-Ohio-2335.]

COURT OF APPEALS
TUSCARAWAS COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | JUDGES: |
| | : | Hon. William B. Hoffman, P.J. |
| Plaintiff - Appellee | : | Hon. Patricia A. Delaney, J. |
| | : | Hon. Craig R. Baldwin, J. |
| -vs- | : | |
| | : | |
| TANYA M. HALL | : | Case No. 2017 AP 11 0031 |
| | : | |
| Defendant - Appellant | : | O P I N I O N |

CHARACTER OF PROCEEDING:     Appeal from the New Philadelphia
                             Municipal Court, Case No.
                             CRB1700766

JUDGMENT:                    Affirmed

DATE OF JUDGMENT:            June 13, 2018

APPEARANCES:

For Plaintiff-Appellee                   For Defendant-Appellant
LACEE FELIX
Asssatant City Prosecutor
New Philadelphia City Prosecutor's Office    ABIGAIL J. CHRISTOPHER
150 E. High Ave.                             Assistant Public Defender
New Philadelphia, Ohio 44663                 Tuscarawas County Public Defender
                                             153 N. Broadway St.
                                             New Philadelphia, Ohio 44663

*Baldwin, J.*

{¶1}   Defendant-appellant Tanya M. Hall appeals her conviction and sentence from the New Philadelphia Municipal Court on one count of cruelty against a companion animal. Plaintiff-appellee is the State of Ohio.

STATEMENT OF THE FACTS AND CASE

{¶2}   On June 19, 2017, appellant was charged with one count of cruelty against a companion animal in violation of R.C. 959.131(B). At her arraignment on June 29, 2017, appellant entered a plea of not guilty to the charge.

{¶3}   Thereafter, a bench trial was held on October 3, 2017. At the trial, Terry Warner, the Tuscarawas County Dog Warden who was the Assistant Dog Warden at the time of the incident in this case, testified that he received a call on June 19, 2017 from the Sheriff's Department.  On the day in question, it was hot, sunny and humid. Warner testified that the Sheriff's Office had notified him that a person on Club Lane was being bit by a dog and that the dog was confined at the time. He further testified that it took him 25 to 30 minutes to arrive at the location after receiving the call.

{¶4}   When he arrived at the location, Warner spoke with appellant who showed him where she had been bitten by the dog on her arms. Appellant, according to him, was "worked up, scared, stressed," and told him that the dog, which was a pit bull mix, had attacked her.  Trial Transcript at 10.  Appellant told Warner that the dog was in her car and when he looked inside, he saw that the dog was breathing rapidly. The dog had a temperature of 108 degrees and was transported to a local veterinarian's office where it later died on the same day of heat stroke. It had been 115 degrees inside the car. Warner testified that his office did not have any prior reports of the dog attacking anyone.

{¶5} Warner further testified that when he spoke with appellant, she told him that she had put the dog in the vehicle after she was unable to get the dog back into her mobile home when she was leaving for a doctor's appointment. At the time, the vehicle was not running and the windows were not down. He did not think that the vehicle was locked.

{¶6} Miranda Christmas testified at the bench trial that appellant lived with her and that the dog had been her dog. She testified that the dog was a loving, smart dog and that if a person was trying the leave the house, he would "jump and he would, you know, like grab your arm," Trial Transcript at 35. Christmas testified that she did not think that the dog intended to attack anyone, but that his intention was to "keep you there, you know, by all means possible he was going to keep you there or he was going with you." Trial Transcript at 35. The following testimony was adduced when she was asked if she had ever known the dog to be violent or bite someone:

{¶7} A: Yes. He bit my neighbor. My neighbor was wrestling with him and he drew blood at his ear and he one time bit her husband when he was trying to leave. He was trying to get him to go outside so she could leave and he, I think he got him in the face, in the cheek.

{¶8} Q: In your written statement to the warden you referred to those as love bites. Is that how you would refer to those?

{¶9} A: Well that's what we, I mean that's what we called them because we knew he wasn't trying, really trying to hurt us but he, he was so much different with her [appellant] because she was the one that was with him twenty-four seven and, you know, like me not being there I could see him possibly getting aggressive enough to actually bite her because she was trying to leave the house.

{¶10} Q: Can I have, can I draw your attention really quick to the State's Exhibits E and F, if you can find those?

{¶11} A: Okay.

{¶12} Q: Those are the photographs of the, her arms from the incident?

{¶13} A: Mm-hm.

{¶14} Q: Are those consistent, those photographs of those injuries you've seen in the past from the love bites?

{¶15} A: Yeah, yeah, but like I said, you know, you got a pit bull coming at you, kind of scary even if you know him.

{¶16} Trial Transcript at 38.

{¶17} On cross-examination, Christmas testified that she knew that appellant had given the dog to a shelter shortly before the incident and that the dog originally had belonged to appellant. Christmas admitted that she had gone back to the shelter and retrieved the dog and that appellant had told her that she had given the dog away because the dog had bitten her husband, causing him to bleed. She further testified that the dog had bitten her neighbor, drawing blood, and appellant's friend. Christmas testified that the dog was more aggressive after being retrieved from the shelter. She admitted that appellant knew that the dog was capable of making people bleed.

{¶18} After the State rested, the defense called Richard Hall, appellant's husband, to the stand. He testified that the dog bit him in the face in June of 2017 and that he was fearful that the dog would bite someone else.

{¶19} Appellant testified that she took the dog to the shelter on a Thursday because he would attack anyone who tried leaving the house and that Christmas retrieved

him on Tuesday. She testified that she had a doctor appointment on June 19, 2017 and that the dog started acting in an aggressive manner when he saw that she was getting ready to leave. Appellant testified that she tried to calm the dog down, and that he was being overly aggressive.  She testified that the dog would not stay inside the house or the backyard and that she decided to take the dog with her.  As soon as appellant opened the door, the dog got into the car. When asked how he acted, she testified that he was still "lunging at my face and I, I got my face, he got me right here on my eye…" Trial Transcript at 56. According to appellant, the dog would not let her in or near the car without lunging at her.  Therefore, she was unable to get her keys out of the car or roll the car windows down.

{¶20}  Appellant, when asked what she thought would happen if she let the dog out of her car, testified that she thought that he would have attacked her or someone else. She indicated that she was afraid that the dog was going to harm her, but that she did not want to harm him. Appellant testified that she went next door and called the Sheriff and that the Sheriff never came but the Dog Warden took approximately 25 to 30 minutes to arrive.

{¶21} On cross-examination, appellant testified that right after closing the car door, she ran over to the neighbors and called the Sheriff's Department, telling them to hurry because it was hot. She further testified that when the Dog Warden arrived, she told him immediately that the dog was in the car and that the car windows were not down. She stated that she did not intend to kill the dog and did not think that it was a possibility. On redirect, she testified that she called the Sheriff because she was concerned about the dog and thought that the Sheriff could get there faster.

**{¶22}** The trial court, at the conclusion of the evidence, found appellant guilty. As memorialized in a Judgment Entry filed on November 3, 2017, the trial court ordered that appellant serve 30 days in jail, but suspended the 30 days and placed appellant on community control for a period of 24 months. The trial court also ordered appellant to complete 60 days of community service within 90 days, fined appellant $100.00 and prohibited appellant from owning, possessing or purchasing any companion animals.

**{¶23}** Appellant now raises the following assignment of error on appeal:

**{¶24}** I. THE COURT SHOULD OVERTURN THE TRIAL COURT'S CONVICTION OF TANYA HALL BECAUSE THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION BY FAILING TO APPLY THE CORRECT RULE OF LAW BECAUSE THE JUDGE IGNORED ORC [Section]955.28, WHICH ALLOWS A PERSON BEING CHASED BY A DOG IN A MENACING FASHION TO KILL THE DOG, WHEN THE JUDGE STATED THAT SHE BELIEVED TANYA HALL'S TESTIMONY THAT THE DOG WAS TRYING TO ATTACK HER.

I

**{¶25}** Appellant, in her sole assignment of error, argues that the trial court erred in failing to apply R.C. 955.28. We note that appellant does not argue that her conviction is against the manifest weight and/or sufficiency of the evidence. The only issue raised by appellant is that the trial court erred in not applying R.C. 955.28 and that such section precludes her conviction because it precludes prosecution for cruelty to animals if the animal which is killed or injured was a danger to her. Appellant raised this affirmative defense in closing arguments to the trial court.

**{¶26}** R.C. 955.28 states, in relevant part, as follows:

(A)    Subject to divisions (A)(2) and (3) of section 955.261 of the Revised Code, a dog that is chasing or approaching in a menacing fashion or apparent attitude of attack, that attempts to bite or otherwise endanger, or that kills or injures a person or a dog that chases, threatens, harasses, injures, or kills livestock, poultry, other domestic animal, or other animal, that is the property of another person, except a cat or another dog, can be killed at the time of that chasing, threatening, harassment, approaching, attempt, killing, or injury. If, in attempting to kill such a dog, a person wounds it, the person is not liable to prosecution under the penal laws that punish cruelty to animals. Nothing in this section precludes a law enforcement officer from killing a dog that attacks a police dog as defined in section 2921.321 of the Revised Code.

**{¶27}** As noted by the court in *State v. Hurst*, 4th Dist. Gallia No. 98CA08, 1999 WL 152262 at 1:

R.C. 955.28 provides an affirmative defense to a charge of cruelty to animals if a dog is chasing or approaching a person in a menacing manner. *State v. Bravard* (Oct. 6, 1986), Warren App. No. CA85-12-093, unreported. See, also, *Penny v. Fourman* (Nov. 6, 1998), Darke App. No. 98CA1465, unreported (R.C. 955.28(A) establishes self-defense as a defense in a civil action for damages for the killing or injuring of a dog). The burden of going forward with the evidence of an affirmative defense and the burden of proof for an affirmative defense is upon the accused. R.C. 2901.05(A). Thus, R.C. 955.28 does not bar the prosecution of a person for animal cruelty who kills

or injures a dog in self-defense. Rather, R.C. 955.28 provides an affirmative defense to be used in such a prosecution. Whether the accused is entitled to acquittal because of the affirmative defense is to be resolved by the finder of fact. See, *e.g., State v. Hayes* (Feb. 2, 1988), Franklin App. No. 87AP-700, unreported.

{¶28} "The proper standard for determining in a criminal case whether a defendant has successfully raised an affirmative defense under R.C. 2901.05 is to inquire whether the defendant has introduced sufficient evidence, which, if believed, would raise a question in the minds of reasonable men concerning the existence of such issue." *State v. Melchior*, 56 Ohio St.2d 15, 381 N.E.2d 195, paragraph one of the syllabus (1978).

{¶29} As an initial matter, we note that, contrary to appellant's assertion, the trial court did not state that it believed appellant's testimony that the dog was trying to attack her. Rather, the trial court stated, in relevant part, as follows: "They [dogs] don't know how to act and then somebody's got to get ready to go to a doctor's appointment and can't get the dog in the backyard apparently, which I really can't figure that one out but I'll accept that as true…" Trial Transcript at 66. (Emphasis added).

{¶30} Appellant testified that she decided to put the dog into the car and take it with her to her doctor appointment. Thus, at the time she put the dog in the car, she did not fear the dog. The dog was not, at that time, chasing or approaching her or another person in a menacing manner. The trial court, as trier of fact, stated that she did not believe that was a vicious dog, but rather thought that the dog was a "very poorly trained dog that did not have responsible owners." Trial Transcript at 65. As is stated above, whether the accused is entitled to acquittal because of the affirmative defense is to be

resolved by the finder of fact which in this case was the trial court. No reasonable mind would question whether the dog was chasing or approaching appellant or another person in a menacing manner at the time appellant locked the dog in the car. The State of Ohio, at the trial in the matter, argued, in relevant part, as follows:

> I believe it was the Defendant's intention to use a self-defense defense in this case. I think the Court can tell by the photos as well as the testimony that this was normal, typical young dog behavior, that the jumping and scratching, the biting that really didn't break the skin, was not indicative of a dog attack. It was more the regular behavior of the dog. I don't believe it was a justification for locking the dog in a vehicle, subsequently killing the dog." Trial Transcript at 64.

**{¶31}** Based on the foregoing, appellant's sole assignment of error is overruled.

**{¶32}** Accordingly, the judgment of the Tuscarawas County Municipal Court is affirmed.

By: Baldwin, J.

Hoffman, P.J. and

Delaney, J. concur.